09 CV 2467

JAMES CLARKSON
ACTING REGIONAL DIRECTOR
Andrew M. Calamari
Robert J. Burson *(Not admitted in New York)*
Alexander M. Vasilescu
Israel Friedman
Aaron P. Arnzen *(Not admitted in New York)*
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION                 :

                    Plaintiff,                          :

                                        :      ___ Civ. ___

    - against -                                   :

                                          :

DAVID G. FRIEHLING,                                :
FRIEHLING & HOROWITZ, CPA'S, P.C.                  :

                    Defendants.                         :

------------------------------------------------------------------------------x

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants David G. Friehling ("Friehling") and Friehling & Horowitz, CPA's, P.C. ("F&H",

and collectively with Friehling, "Defendants"), alleges:

### SUMMARY

1.     This case involves knowing and repeated material misrepresentations to investors

and the Commission by Friehling and F&H, the accountants retained by Bernard L. Madoff

("Madoff") to purportedly audit his broker-dealer, Bernard L. Madoff Investment Securities LLC

("BMIS").

2. From 1991 through 2008, while Madoff used BMIS to conduct his massive Ponzi scheme, Friehling, a certified public accountant ("CPA") and the principal of F&H, enabled Madoff's misconduct by falsely representing to investors that BMIS was financially sound and that Friehling and F&H were independent auditors that had conducted audits of BMIS each year. In documents that Friehling and F&H knew were distributed or submitted to investors and the Commission, Friehling and F&H knowingly or with reckless disregard falsely stated that:

> a. F&H audited BMIS' financial statements pursuant to Generally Accepted Auditing Standards ("GAAS"), including the requirements to maintain auditor independence, and to perform audit procedures regarding custody of securities;
>
> b. BMIS' financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP"); and
>
> c. Friehling had reviewed the internal control environment at BMIS, including internal controls over the custody of securities, and found no material inadequacies.

3. All of these statements were materially false because Friehling and F&H did not perform anything remotely resembling an audit of BMIS and, critically, did not perform procedures to confirm that the securities BMIS purportedly held on behalf of its customers even existed. Instead, Friehling merely pretended to conduct minimal audit procedures of certain accounts to make it seem like he was conducting an audit, and even then failed to document his purported findings and conclusions as required under GAAS. If properly stated, those financial statements, along with BMIS' related disclosures regarding reserve requirements, would have

2

shown that BMIS owed tens of billions of dollars in additional liabilities to its customers and thus was insolvent. Similarly, Friehling did not conduct any audit procedures with respect to BMIS' internal controls, and he knew or recklessly disregarded that he had absolutely no basis to represent that BMIS had adequate internal controls.

4. Friehling knowingly or recklessly made these false statements in an effort to help Madoff avoid any real scrutiny of BMIS' investment operations.

5. In addition to the conduct alleged above, Friehling falsely represented to the American Institute of Certified Public Accountants ("AICPA") that he was not engaged in audit work. By doing so, Friehling avoided the AICPA's peer review requirements applicable to auditors, which might have exposed that his so-called audit work for BMIS was a sham and might have exposed BMIS to greater scrutiny. Friehling also furthered the fraud by authorizing BMIS to send account confirmation documents to its customers falsely identifying F&H as BMIS' independent accountant, and representing that F&H conducted audits of BMIS. Moreover, Friehling purported to perform agreed-upon procedures on the accounts of specific BMIS customers who had requested that he do so. In fact, Friehling did not subject these accounts to such procedures, but he nevertheless represented to these customers and their auditors that he had performed the procedures and found no problems. All of these actions were designed to, and did, shield BMIS and Madoff from any real scrutiny by regulators, customers, and qualified auditors.

6. Friehling and F&H obtained ill-gotten gains through compensation paid to them by Madoff and BMIS and also by withdrawing millions of dollars from accounts held at BMIS in the name of Friehling and his family members.

3

## VIOLATIONS

7.      By virtue of the conduct alleged herein, Defendants directly or indirectly, singly or in concert, have engaged in acts, practices, schemes and courses of business that violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], violated and aided and abetted violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and aided and abetted violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)], Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3], and Section 17 of the Exchange Act [15 U.S.C. § 78q] and Rule 17a-5 thereunder [17 C.F.R. § 240.17a-5].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking to restrain and enjoin permanently the Defendants from engaging in the acts, practices and courses of business alleged herein.

8.      In addition to the injunctive relief recited above, the Commission seeks: (i) final judgments ordering Defendants to disgorge their ill-gotten gains with prejudgment interest thereon; and (ii) final judgments ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(d)].

4

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [ 15 U.S.C. § 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

11.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391. The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, or of the mails and wires, in connection with the transactions, acts, practices and courses of business alleged herein. A substantial part of the events comprising Defendants' fraudulent activities giving rise to the Commission's claims occurred in the Southern District of New York, and Defendants maintained their sole office in this District until December 2008.

## THE DEFENDANTS

12.     **Friehling**, age 49, is a resident of New City, New York. Friehling is licensed in the State of New York as a CPA, and is the sole shareholder of F&H. Friehling is also the son-in-law of his former partner. From 1991 through 2008, F&H audited the financial statements contained in BMIS' Annual Audited Report as filed with the Commission on Form X-17A-5. Since approximately 1980, Friehling and his family members have had accounts at BMIS, and they have withdrawn over $5.5 million from these accounts since 2000 alone.

13.     **F&H**, located in New City, New York, is a public accounting firm registered with the AICPA. Friehling is F&H's only CPA, and the firm's sole shareholder. Friehling formed F&H in or around 1988 when he partnered with his father-in-law, who is now deceased.

Friehling's acts and omissions alleged herein were undertaken on behalf of F&H, and such acts and omissions are imputable to F&H.

## RELEVANT INDIVIDUALS AND ENTITIES

14.     **Madoff**, age 70, is a resident of New York City and is the sole owner of BMIS. Until December 11, 2008, Madoff, a former chairman of the board of directors of the NASDAQ stock market, oversaw and controlled the investment adviser services at BMIS as well as the overall finances of BMIS. Madoff currently faces civil and criminal charges for his role in a multi-billion dollar Ponzi scheme orchestrated since at least 1991. (S.E.C. v. Bernard L. Madoff and Bernard L. Madoff Investment Securities LLC, S.D.N.Y. 08 CV 10791 (LLS); United States v. Bernard L. Madoff, S.D.N.Y. 09 Cr. 213 (DC) ("the Criminal Action")). On March 12, 2009, Madoff pled guilty to eleven felonies in the Criminal Action and admitted in his allocution to, among other things, committing a Ponzi scheme, securities fraud, investment advisor fraud, and filing false audited financial statements with the Commission on behalf of BMIS.

15.     **BMIS**, located in New York City, registered with the Commission as a broker-dealer in 1960 and as an investment adviser in 2006. BMIS purportedly engaged in three different operations: investment adviser services, market making services, and proprietary trading. BMIS reported to the Commission that it had over $17 billion in assets under management as of January 2008. BMIS is currently under the control of a trustee appointed pursuant to the Securities Investor Protection Act of 1970.

# FACTS

## A.     Bernard Madoff's Ponzi Scheme

16.     From at least the 1980s until December 11, 2008, Madoff and BMIS conducted a Ponzi scheme through the investment adviser and brokerage services of BMIS.

17.     Until December 11, 2008, Madoff purported to conduct certain investment advisory and brokerage services for clients that were separate from BMIS' proprietary trading and market making activities. In or about the first two weeks of December 2008, Madoff told one or more BMIS senior employees that he had received requests from clients for billions of dollars in redemptions, and that he was struggling to obtain the liquidity necessary to meet those obligations. Madoff admitted at the time that his investment advisory business was a fraud, that he was "finished," that he had "absolutely nothing" and "it's all just one big lie," and that it was "basically, a giant Ponzi scheme."

18.     In substance, Madoff communicated to the referenced senior employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent and had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion.

19.     Madoff and BMIS made many misrepresentations, including misrepresentations and omissions in BMIS' audited annual reports, to investors in connection with the purchase or sale of securities.

**B. BMIS' Audited Annual Report Portrayed BMIS As A Financially Sound Broker-Dealer.**

20.     As a broker-dealer registered with the Commission, BMIS was required to file an annual report, including financial statements and related disclosures, with the Commission on Form X-17A-5. Exchange Act Rule 17a-5 requires that these financial statements be accompanied by an independent auditor's report addressing both the presentation of the financial statements as well as any material inadequacies in the broker-dealer's internal controls. Rule 17a-5(g) requires that the audit of a registered broker-dealer be sufficient to enable the auditor to express an opinion upon, among other things, the broker-dealer's computation of net capital and customer reserve requirements. Since 1991, Friehling has signed these annual audit reports regarding BMIS on behalf of F&H.

21.     In his annual audit reports, Friehling represented that F&H had audited BMIS "in accordance with auditing standards generally accepted in the United States," and that based on its audits, BMIS' financial statements were presented fairly "in conformity with accounting principles generally accepted in the United States of America." F&H's audit reports also represented that information appearing in the schedules and disclosures accompanying the financial statements were "subjected to the same auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated."

22.     These financial statements portrayed BMIS as a financially sound broker-dealer. For example, the 2007 Form X-17A-5 states that BMIS' assets were $1.093 billion, its liabilities $425 million, and its equity $668 million. BMIS' 2006 Form X-17A-5 states that the broker-dealer's assets were $1.304 billion, its liabilities $700 million, and its equity $604 million.

23. In fact, because of the Ponzi scheme, BMIS' statement of financial position and disclosures regarding reserve requirements should have reflected enormous liabilities to its customers. Madoff affirmatively represented to customers that BMIS was investing their funds in a particular way and realizing positive returns, when the truth is that BMIS was not executing its purported investment strategy or realizing related returns. These misrepresentations created a staggering, unreported, multi-billion dollar contingent liability that would have been required to be reported under Statement of Financial Accounting Standards No. 5: Accounting for Contingencies. Had Friehling and F&H, in fact, audited the custody of securities, the Ponzi scheme would have been exposed and BMIS' enormous liability revealed.

24. BMIS' Forms X-17A-5 also included a separate "Independent Auditors' Report on Internal Control" in which Friehling represented each year that F&H had evaluated BMIS' internal controls, including "[m]aking the quarterly securities examinations, counts, verifications, and comparisons, and the recordation of differences required by rule 17a-13." The report went on to state that "we noted no matters involving internal control, including control activities for safeguarding securities, that we consider to be material weaknesses."

25. Friehling knew or recklessly disregarded that F&H's audit reports reached investors, the Commission, and other regulators. Specifically, Friehling knew or recklessly disregarded that (a) his audit reports state that F&H had audited the financial statements "that you [BMIS] are filing pursuant to [R]ule 17a-5 under the Securities Exchange Act of 1934;" (b) Rule 17a-5 mandates that a portion of the Forms X-17A-5, including F&H's audit report, be available to the public; (c) F&H's audit reports accompanied small, attractively bound copies of BMIS' statements of financial condition that Madoff and BMIS distributed directly to investors;

9

and (d) BMIS provided copies of F&H's audit report on internal controls directly to certain investors.

26. BMIS' audited annual report lulled customers into trusting BMIS and Madoff with their investments in several significant ways: by portraying BMIS as a financially sound broker-dealer with no material inadequacies in internal controls, and by assuring customers and regulators that BMIS was subject to the scrutiny of an independent auditor.

27. The issue of custody was especially important for BMIS' customers because Madoff told customers that BMIS self-custodied and self-cleared securities held on their behalf.[1] Friehling and F&H knew or recklessly disregarded that BMIS customers would rely on the auditors to examine the custody and safeguarding of securities.

28. As alleged below, the purpose of a GAAS audit is to test a client's financial statements and related disclosures. One of the fundamental audit tests performed on a broker-dealer is to ascertain that securities held in the custody of the broker-dealer do, in fact, exist. Indeed, custody-related tests are described throughout the AICPA's Audit and Accounting Guide for Brokers and Dealers in Securities. Securities regulations further heighten the emphasis on testing custody, given that Exchange Act Rule 17a-5(g) mandates that the auditor review quarterly securities counts and verifications (which are required of the broker-dealer under Exchange Act Rule 17a-13), and opine on the broker-dealer's procedures for safeguarding

---

[1] BMIS' representation that it self-custodied and self-cleared meant that BMIS was a member/participant in the Depository Trust Company ("DTC"), a clearing organization. BMIS customers were led to believe that securities held by BMIS on their behalf were actually held at DTC in the name of BMIS.

securities. The AICPA guide repeatedly refers to the procedures set forth in Rule 17a-13 with respect to the auditor's responsibility under Rule 17a-5(g).

29.     Based on information received from BMIS, including BMIS' statement of financial condition and F&H's audit reports, customers continually invested more money with BMIS. Of course, customers had no idea that the representations in F&H's audit reports were false and made without any factual basis.

**C.      Friehling And F&H Conducted Sham Audits Of BMIS.**

**1.      Friehling And F&H Did Not Conduct Any Meaningful Audit Procedures Related To BMIS.**

30.     GAAS requires that an auditor obtain "sufficient competent evidential matter" to afford a reasonable basis for his/her opinion regarding the financial statements under audit. See AU Section 326.01. Moreover, "[t]he auditor should use professional judgment and should exercise professional skepticism in evaluating the quantity and quality of audit evidence, and thus its sufficiency and appropriateness, to support the audit opinion." See AU Section 326.13. Gathering and analyzing such evidentiary matter is the most fundamental part of an audit – if an auditor fails appropriately to test and verify a client's transactions and account balances, his audit is rendered virtually meaningless.

31.     Friehling did not just violate these provisions; he failed to perform any meaningful audit procedures relating to BMIS. Indeed, only three procedures that even resembled audit tests were performed – and even these were mere fiction and virtually irrelevant to an audit opinion:

11

a. *Customer Confirmations* – Friehling did not perform this critical audit test. Rather, to create the illusion of an audit in the minds of BMIS customers, BMIS, with Friehling's approval, sent account confirmation forms to hundreds of BMIS customers along with their account statements each fiscal year. Friehling did not select the accounts holders to which confirmations were sent – BMIS made this selection. The confirmation form stated that, in conjunction with F&H's audit, customers should notify F&H if they disagreed with the information on their account statements. These confirmations had no value from an audit perspective because BMIS chose which accounts to "test," and Friehling made no attempt to reconcile the returned confirmations to amounts reported in BMIS' records or systems. Moreover, the account holders had no means to independently confirm, or not, the accuracy of the account statements, the contents of which had been supplied solely by BMIS.

b. *Physical Security Inventory* – Each year, Friehling engaged in the essentially meaningless exercise of counting the physical security certificates that happened to be maintained on BMIS' premises. However, Friehling did not attempt to include any certificates purportedly held by clearing organizations or depositories in these counts. Nor did Friehling attempt to reconcile the count he did to BMIS' records or systems. Friehling also failed to identify the location and amount of the entire population of securities purportedly held by BMIS that should have been subjected to auditor counts and confirmation.

c. *Cash Confirmations* – Friehling intermittently obtained cash confirmations from banks identified on BMIS' general ledger. However, Friehling did not send confirmations regarding a bank account through which BMIS received billions of dollars of investments from its customers, and from which BMIS paid redemptions to its customers. Appropriately designed audit procedures would have analyzed activity in a bank account that funded such significant investments and redemptions. Friehling knew of the account because it was included in the general ledger for at least eight years (1991-1998) during which he prepared Forms X-17A-5 for BMIS.

32. Friehling's failure to conduct essentially any audit testing left BMIS' purported transactions, balances, financial statements and disclosures altogether unexamined. Perhaps most critically, Friehling did not attempt to confirm that the securities BMIS purportedly held on behalf of its customers even existed, which is a standard and fundamental procedure for broker-dealer audits according to the AICPA's Audit and Accounting Guide for Brokers and Dealers in Securities.

33. Further, Friehling affirmatively represented in his Independent Auditor's Report on Internal Controls that he reviewed "the quarterly securities examinations, counts, verifications, and comparisons, and the recordation of differences required by [SEC] rule 17a-13." Rule 17a-13, in turn, requires broker-dealers to conduct quarterly counts of securities, through both physical examination and confirmation of securities held by third parties. Rule 17a-5(g) requires the auditor to review these quarterly counts, and to opine on whether proper procedures are in place for safeguarding securities. Beyond his partial, un-reconciled count of

13

whatever physical securities happened to be on BMIS premises, Friehling did not even purport to perform this basic audit step. If he had done so with respect to a sample of BMIS accounts, there can be little doubt that he would have realized that BMIS did not hold any securities on behalf of its customers.

34.     Friehling also failed to gather or analyze audit evidence surrounding (1) BMIS' revenues; (2) BMIS' compliance with its disclosures regarding significant accounting policies; or (3) BMIS' computations of net capital and reserve requirements.

### 2.     Friehling And F&H Did Not Prepare Any Documentation Of Their Audits.

35.     Auditing standards require the preparation of audit documentation allowing an experienced auditor, unfamiliar with the engagement, to understand the "nature, timing, and extent of auditing procedures performed," the "results of the audit procedures," and the "conclusions reached on significant matters." AU Section 339.10. Friehling and F&H did not create or maintain audit workpapers documenting audit procedures, findings, or conclusions related to BMIS.

### 3.     Friehling And F&H Did Not Comply With Many Other Critical Auditing Standards.

36.     Friehling and F&H did not attempt to satisfy many other fundamental auditing standards. Friehling did not plan the audit (as required by AU Section 311); assess materiality or audit risk (AU Section 312); assess BMIS' internal control environment (AU Section 312); obtain and analyze sufficient and appropriate audit evidence, as alleged above (AU Section 326); or obtain a sufficient basis (or any basis, for that matter) for expressing an opinion on BMIS' financial statements, or the related schedules and disclosures (id.).

14

### 4. Friehling's Purported Opinions That BMIS' Financial Statements Conformed With GAAP Were Knowingly Or Recklessly False.

37.    Since 1991, Friehling has offered F&H's purported opinion, based on his purported audit, that BMIS' financial statements "present fairly, in all material respects, the financial position of Bernard L. Madoff Investment Securities LLC." F&H also purported to opine that BMIS' alternate net capital requirement presentation was "fairly stated in all material respects."

38.    Contrary to these statements, Friehling knew or recklessly disregarded that he had not audited BMIS or its investment advisory business and, therefore, knew or recklessly disregarded that he had no basis upon which to express an opinion regarding BMIS' financial statements or net capital calculations. Friehling's representation that BMIS' financial statements and disclosures were fairly stated in accordance with GAAP was knowingly or recklessly false. In contrast to its reported results, which portrayed a financially-sound broker-dealer, BMIS owed tens of billions of dollars in unreported liabilities to its customers and thus was insolvent.

### 5. Friehling And F&H Issued Bogus, Unsupported Opinions On BMIS' Internal Controls.

39.    BMIS' annual audited report included an Independent Auditors' Report on Internal Control. In this report, F&H represented that it had reviewed BMIS' internal control environment and found "no matters involving internal control, including control activities for safeguarding securities, that we consider to be material weaknesses."

40.    Contrary to this report, Friehling did not conduct any type of internal control review at BMIS. Friehling never made any inquiries, or took any other steps, to understand or assess BMIS' internal control environment. Instead, it was Madoff who realized that the

15

Commission required a report on internal controls, and asked BMIS' management to prepare a report for Friehling's signature. The report was presented to Friehling, who signed it without question.

### 6. Friehling And F&H Falsely Stated They Were Independent Of Madoff.

41. Friehling and F&H also violated auditor independence requirements and falsely represented to the Commission, other regulators and customers of BMIS that Friehling and F&H were independent of BMIS. Friehling and his family members have long held accounts with BMIS. These accounts were reported to be worth over $14 million as of November 30, 2008.[2]

42. Independence standards require that an auditor "must be free from any obligation to or interest in the client, its management, or its owners." (AU Section 220.03; see also AICPA Code of Professional Conduct, ET Section 101). Under Commission regulations, independence is impaired when an accountant has "[b]rokerage or similar accounts maintained with a broker-dealer that is an audit client, if ... [t]he value of assets in the accounts exceeds the amount that is subject to a Securities Investor Protection Corporation ["SIPC"] advance, for those accounts, under Section 9 of SIPA." See Rule 2-01(c)(1)(ii)(C)(2) of Regulation S-X (this regulation applies to audits of broker-dealers under Rule 17a-5(f)(3) of the Exchange Act). Because the SIPC advance amount is $500,000, and Friehling's and his family's accounts exceed $14 million, Friehling and F&H violated independence standards.

---

[2] Friehling also took steps to hide his investment with BMIS. Friehling replaced his own name on his BMIS account with his wife's name, and later named the account the "Friehling Investment Fund" in an effort to conceal the conflict of interest.

43.     Friehling also violated auditor independence rules because he performed bookkeeping functions at BMIS, including preparing its financial statements. Rule 2-01(c)(4)(i) of Regulation S-X states that an accountant is not independent if he/she maintains or prepares the client's accounting records or financial statements that will be subjected to audit procedures. Here, the financial statements prepared by Friehling would certainly be subjected to audit procedures in a GAAS audit.

**D.     Friehling Knowingly Or Recklessly Issued False Audit Reports.**

44.     Friehling knew or recklessly disregarded that his statements described above were false and misleading. Friehling also knew or recklessly disregarded that he played a part in a concerted effort by Madoff to keep BMIS' investment operations free from scrutiny.

45.     First, annually since 1994, Friehling falsely told the AICPA that he did not conduct audits. AICPA members that do conduct audits are required to submit to periodic peer review, which includes a review of audit workpapers. Friehling did not disclose his audit engagement with BMIS because he knew that a peer review would likely reveal that he had not conducted a GAAS audit, which, in turn, might lead to further scrutiny of Friehling and BMIS.

46.     Second, Friehling knowingly or recklessly allowed BMIS to send over 100 account confirmation forms to BMIS customers each year. The confirmation forms stated that BMIS was being audited by F&H, an independent accountant. Contrary to this representation, F&H was not independent and did not conduct an audit. These confirmations constitute direct communications from BMIS, with Friehling's knowledge and approval, that misled customers to believe that BMIS was a financially healthy, solvent firm that was placed under appropriate scrutiny each year by an independent accountant. In other words, the point of issuing

17

confirmation requests was to give customers the false comfort that their BMIS accounts were audited.

47.     Third, Friehling was directly engaged by several customers, or the customers' auditors, to perform agreed-upon procedures with respect to the customers' BMIS accounts. Friehling failed to perform many of the agreed-upon procedures, including ascertaining whether BMIS held assets on behalf of the customers in a segregated account, verifying reported transactions by means of third-party documentation, and ascertaining the basis for BMIS' remuneration related to the customers' accounts. Nevertheless, Friehling knowingly or recklessly made false representations to these customers or their auditors, in writing, that he had performed the procedures in question, including tests to establish that the securities in the customer's accounts actually existed.

48.     Finally, Friehling and F&H profited from their misconduct in two ways – by drawing a substantial fee from BMIS, and by withdrawing substantial profits from accounts at BMIS. Friehling and F&H received $186,000 per year in fees from BMIS for providing the purported audit work described above, along with bookkeeping and tax services for Madoff and various Madoff family members. Further, Friehling's and his family's BMIS accounts had an accumulated balance at November 30, 2008 of over $14 million, and withdrawals from the largest of these accounts total over $5.5 million since 2000.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(1) of the Securities Act
(Against all Defendants)
(Antifraud violations)

49.     Paragraphs 1 through 48 are realleged and incorporated by reference as if set forth fully herein.

50.     From at least 1991 through December 11, 2008, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails and/or wires, directly and indirectly, have employed devices, schemes and artifices to defraud.

51.     The Defendants knew or were reckless in not knowing of the activities described above.

52.     By reason of the activities herein described, the Defendants have violated Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act
(Against all Defendants)
(Antifraud violations)

53.     Paragraphs 1 through 48 are realleged and incorporated by reference as if set forth fully herein.

54.     From at least 1991 through December 11, 2008, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails and/or wires, directly and indirectly, have obtained money and property by means of untrue statements of material fact or omissions to state

19

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged in transactions, practices or courses of business which have operated as a fraud and deceit upon investors.

55.     The Defendants knew, were reckless in not knowing, or should have known of the activities described above.

56.     By reason of the activities herein described, the Defendants have violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2) and §77q(a)(3)].

## THIRD CLAIM FOR RELIEF

### Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against all Defendants)
(Antifraud violations)

57.     Paragraphs 1 through 48 are realleged and incorporated by reference as if set forth fully herein.

58.     From at least 1991 through December 11, 2008, the Defendants, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails and/or wires, have employed devices, schemes and artifices to defraud; have made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged in acts, practices and courses of business which operated as a fraud and deceit upon investors.

59.     Defendants knew or were reckless in not knowing of the activities described above.

20

60. By reason of the activities herein described, the Defendants have violated Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

61. In addition, from at least 1991 through December 11, 2008, Madoff and BMIS, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails and/or wires, have employed devices, schemes and artifices to defraud; have made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged in acts, practices and courses of business which operated as a fraud and deceit upon investors.

62. Madoff's and BMIS' untrue statements of material fact and omissions of material facts included representations to customers and clients that F&H audited BMIS' financial statements pursuant to GAAS, that BMIS' financial statements were presented in conformity with GAAP; and that F&H had reviewed the internal control environment at BMIS, including internal controls over the custody of securities, and found no material inadequacies.

63. Defendants knew that these statements were false.

64. By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants have aided and abetted Madoff's and BMIS' violations of Section 10(b) of the Exchange Act [15 U.S.C. 5 78j(b)] and Rule 10b-5(a), (b) and (c) promulgated thereunder [17 C.F.R. 5240.10b-5(a), (b) and (c)]. Specifically, Defendants knowingly provided substantial assistance to Madoff and BMIS in committing such violations.

21

# FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act**
(Against all Defendants)
(Fraud Upon Advisory Clients and Breach of Fiduciary Duty
by Investment Adviser)

65.     Paragraphs 1 through 48 are realleged and incorporated by reference as if set forth fully herein.

66.     Madoff and BMIS at all relevant times were investment advisers within the meaning of Section 201(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

67.     Madoff and BMIS directly or indirectly, singly or in concert, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. §80b-2(11)]: (a) have employed devices, schemes, and artifices to defraud any client or prospective client; or (b) have engaged in acts, practices, or courses of business which operate as a fraud or deceit upon any client or prospective client.

68.     Madoff's and BMIS' untrue statements of material fact and omissions of material facts included representations to clients that F&H audited BMIS' financial statements pursuant to GAAS, that BMIS' financial statements were presented in conformity with GAAP; and that F&H had reviewed the internal control environment at BMIS, including internal controls over the custody of securities, and found no material inadequacies.

69.     Defendants knew these statements were false.

70.     As described in the paragraphs above, Madoff and BMIS violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

71.     By reason of the activities described herein, and pursuant to Section 209(d) of the

Advisers Act [15 U.S.C. § 80b-9(d)], Defendants have aided and abetted violations of Sections

206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]. Specifically,

Defendants knowingly provided substantial assistance to Madoff and BMIS in committing such

violations.

## FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of
Section 15(c) of the Exchange Act and Rule 10b-3**
(Against all Defendants)
(Fraud Upon Customers by Broker-Dealer)

72.     Paragraphs 1 through 48 are realleged and incorporated by reference as if set forth

fully herein.

73.     BMIS is a broker within the meaning of Section 3(a)(4) of the Exchange Act [15.

U.S.C. §78c(a)(4)].

74.     From at least 1991 through December 11, 2008, BMIS, while a broker, by

engaging in the conduct described above, made use of the mails or means or instrumentalities of

interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or

sale of securities (other than commercial paper, bankers' acceptances or commercial bills)

otherwise than on a national securities exchange of which BMIS was a member, by means of

manipulative, deceptive, or other fraudulent devices or contrivances.

75.     BMIS' manipulative, deceptive, and fraudulent devices or contrivances included

representations to customers that F&H audited BMIS' financial statements pursuant to GAAS,

that BMIS' financial statements were presented in conformity with GAAP, and that F&H had

23

reviewed the internal control environment at BMIS, including internal controls over the custody

of securities, and found no material inadequacies.

76.     Defendants knew these statements were false.

77.     By reason of the activities described herein, and pursuant to Section 20(e) of the

Exchange Act [15 U.S.C. § 78t(e)], Defendants have aided and abetted BMIS' violations of

Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. §

240.10b-3]. Specifically, Defendants knowingly provided substantial assistance to BMIS in

committing such violations.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 17 of the Exchange Act and
### Rule 17a-5 Thereunder
(Against all Defendants)
(Misstatements in Broker-dealer Audited Annual Report)

78.     Paragraphs 1 through 48 are realleged and incorporated by reference as if set forth

fully herein.

79.     As a registered broker-dealer, BMIS was required to comply with the reporting

requirements under Section 17 of the Exchange Act [15 U.S.C. § 78q] and Rule 17a-5 thereunder

[17 C.F.R. § 240.17a-5].

80.     Section 17 of the Exchange Act requires brokerage firms to make and disseminate

such reports as the Commission prescribes by rule. Rule 17a-5 sets forth a number of

requirements for broker-dealer reports disseminated under Section 17, including: that a broker-

dealer annually file accurate, audited financial statements; that the broker-dealer's auditor meet

certain qualifications, including specific independence standards; that the audit itself meet certain

24

requirements, including being conducted in accordance with GAAS, and including a review of internal controls and safeguards over securities; and that the auditor determine the nature and extent of his/her audit procedures based on an assessment of internal controls and other procedures in accordance with GAAS.

81.     From at least 1991 through December 11, 2008, BMIS violated Section 17 and Rule 17a-5 thereunder because BMIS' financial statements were inaccurate; there was no independent audit performed in accordance with GAAS of BMIS' financial statements, internal control environment, or safeguarding of securities; and the audit report was inaccurate and unsupported.

82.     Defendants knew that these representations were false.

83.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants have aided and abetted violations of Section 17 of the Exchange Act [15 U.S.C. § 78q] and Rule 17a-5 thereunder [17 C.F.R. § 240.17a-5]. Specifically, Defendants knowingly provided substantial assistance to BMIS in committing such violations.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

## I.

Enter judgments in favor of the Commission finding that the Defendants each violated the securities laws and rules promulgated thereunder as alleged herein;

25

## II.

Final Judgments permanently restraining and enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## III.

Final Judgments permanently restraining and enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## IV.

Final Judgments permanently restraining and enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

## V.

Final Judgments permanently restraining and enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

## VI.

Final Judgments permanently restraining and enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 17 of the Exchange Act [15 U.S.C. § 78q] and Rule 17a-5 thereunder [17 C.F.R. § 240.17a-5]

## VII.

An order directing the Defendants to disgorge their ill-gotten gains, plus prejudgment interest thereon.

## VIII.

Final Judgments directing the Defendants to pay civil money penalties pursuant to

Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9], Section 20(d) of the Securities Act [15

U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Granting such other and further relief as to this Court seems just and proper.

Dated: New York, New York
      March 18, 2009

SECURITIES AND EXCHANGE COMMISSION

By: _James Clarkson_

James Clarkson
Acting Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY 10281-1022
(212) 336-0178

Of Counsel:
Andrew M. Calamari
Robert J. Burson *(Not admitted in New York)*
Alexander M. Vasilescu
Israel Friedman
Aaron P. Arnzen *(Not admitted in New York)*